IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA     :

       v.                 :           **CRIMINAL NO. 21-cr-307**

RODNEY MARTINEZ           :

## GOVERNMENT'S PLEA MEMORANDUM

### I.    INTRODUCTION

The defendant, Rodney Martinez, has agreed to plead guilty to Counts One and Two of an information, charging him with theft from an organization receiving federal funds and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Count One); and bribery concerning an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) (Count Two); and not to contest forfeiture as set forth in the notice of forfeiture charging criminal forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(3)(A), and 28 U.S.C. § 2461. These charges all arise from the defendant's participation in a fraud and bribery scheme in which vendors for SEPTA provided SEPTA managers, like the defendant, with cash and personal products to (1) generate illegal proceeds by falsely billing SEPTA for products the vendors did not provide; and (2) maintain and increase the vendors' business with SEPTA. The defendant further acknowledges his waiver of rights, as set forth in the attachment to this agreement. The parties have entered into a written plea agreement, which is attached here as Exhibit A.

## II.   STATUTORY MAXIMUM PENALTIES

The Court may impose the following statutory maximum sentences: Count One (theft from an organization receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment; and Count Two (bribery involving a program receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 20 years' imprisonment, a three-year period of supervised release, a $500,000 fine, and a $200 special assessment.  Full restitution of $292,345 also shall be ordered.  Forfeiture of $144,285, which represents all proceeds the defendant obtained from the fraud and bribery offenses, also may be ordered.

## III.   ELEMENTS OF THE OFFENSES

### A.   Theft From Federally Funded Program

To establish that the defendant committed the crime of theft from a federally funded program, in violation of **18 U.S.C. § 666(a)(1)(A)**, the government must prove the following essential elements beyond a reasonable doubt:

    1.   The defendant was an agent of an organization;

    2.   The organization received federal benefits in excess of $10,000 in a one-year period;

    3.   The defendant stole, embezzled, obtained by fraud, knowingly converted, or intentionally misapplied property;

    4.   The property is valued at $5,000 or more; and

2

5.    Which property was owned by or in the care, custody, or control of the organization.

**B.    <u>Bribery Concerning a Federal Program</u>**

To establish that the defendant committed the crime of bribery concerning a federal program, in violation of 18 U.S.C. § 666(a)(1)(B), the government must prove the following essential elements beyond a reasonable doubt:

1.  At the time alleged in the information, the defendant was an agent of an organization;

2.  The organization received federal benefits in excess of $10,000 in a one-year period;

3.  The defendant accepted, agreed to accept, solicited, or demanded something of value from someone;

4.  The defendant acted corruptly with the intent to be influenced or rewarded in connection with the business, a transaction, or a series of transactions of the organization; and

5.  The value of the business, transaction, or series of transactions relating to the payment solicited or received by the defendant was at least $5,000.

## IV.   **FACTUAL BASIS FOR THE PLEA**

### A.   **Introduction**

The charges arise from the defendant's participation in a fraud and bribery scheme involving managers in the Bridges and Buildings Department ("BBD") of the Southeastern Pennsylvania Transportation Agency ("SEPTA") and vendors who supplied products to the BBD. The BBD is responsible for maintenance, construction, and rehabilitation work performed at various SEPTA locations. Several SEPTA managers in the BBD used their SEPTA-issued credit cards ("P-Cards") to defraud SEPTA by obtaining cash and personal products from vendors who supplied goods to SEPTA. To cover cost of the products and cash provided to SEPTA employees, the vendors billed SEPTA for products that the vendors did not provide to SEPTA. The vendors generally billed SEPTA as much as double the amount provided to the corrupt managers so they could share in the criminal proceeds. The vendors provided the cash and products to SEPTA managers for two reasons: (1) to generate and share fraud proceeds with the SEPTA managers; and (2) to maintain and increase business from SEPTA. The total loss to SEPTA is approximately $900,000.

Among the different participants in this scheme, there were varying levels of conspiratorial activity and engagement with others. The guideline and other stipulations in Martinez's case, and in the cases of the other participants in the scheme, reflect each participant's role in the scheme and engagement with other participants.

4

**B.**   **General Background Facts**

SEPTA is a metropolitan transportation authority providing rail, trolley, and bus services to passengers within Philadelphia, Pennsylvania, and the surrounding counties as well as service between the States of Delaware and New Jersey. SEPTA is an organization, and an agency of a state government, which received annual benefits in excess of $10,000 under federal programs involving grants, contracts, subsidies, loans, guarantees, and other forms of federal assistance. In fact, in each of the years of the charged fraud, SEPTA received well over $100 million from federal sources.

Throughout the time of the fraud discussed in this memorandum, SEPTA issued "procurement cards," also known as P-Cards, which operated as SEPTA credit cards, to managers working in SEPTA's BBD. The managers worked at various jobsites where SEPTA facilities were under construction for rehabilitation and renovation. SEPTA had established written rules and procedures that were provided to these employees concerning the use of these cards.

SEPTA rules allowed the P-Cards to be used for legitimate business reasons to purchase materials and equipment for jobsites when there was an emergency need for those materials and equipment that were not available in SEPTA's stock system. Under SEPTA rules, most materials for a jobsite should have been purchased in advance of the project through the purchase order process. The SEPTA Procurement Card Procedures Manual ("the Manual") specifically provided that the procurement card program was "not

5

an alternative to, nor is it intended to circumvent, the normal procurement policies and procedures."

Consistent with the purpose of the procurement cards, beginning in 2017, the Manual further limited the use of the cards to (1) $1,000 for a single transaction; (2) $4,000 for daily purchases; (3) and no more than four transactions per day. Employees were not permitted to artificially break up purchases to hide violations of the rules, e.g., by making multiple purchases to avoid crossing the $1,000 threshold, also known as "fragmenting." Prior to 2017, these limits were lower, *i.e.,* $500 for a single transaction and $2,000 for daily purchases.

### C.     **The Fraud Activity**

#### 1.     The Overall Scheme

For many years, beginning around 2013, SEPTA managers with the BBD engaged in a fraud and bribery scheme with particular SEPTA vendors to defraud SEPTA by abusing SEPTA's P-Card system. The vendors provided SEPTA managers with cash and merchandise in exchange for vendors billing SEPTA for products that the vendors did not provide. The vendors shared in the proceeds of the fraud.

The two primary vendors involved in this fraud were MSI Tool Repair and Supply and AM Services and Supplies (collectively referred to here as "MSI") and Advantage Industrial Supply ("AIS"). SEPTA records show that MSI was the highest biller on the SEPTA P-cards. From 2010 through 2019, MSI billed SEPTA approximately $3.7 million for products and tool repair services. The third highest biller during this period

was AIS, charging SEPTA $1.9 million for industrial supplies. MSI was owned and operated by Mark Irvello. AIS was owned and operated by Stanley Woloff. Both Irvello and Woloff are charged in related cases.

The scheme began around 2013 when David Abell separately agreed, first with Irvello of MSI, and then with Woloff of AIS (collectively "the vendors"), to engage with each of them in a fraud and bribery scheme against SEPTA. Abell agreed with the vendors that the vendors would provide Abell with regular cash payments for Abell's personal benefit and that the vendors would falsely bill SEPTA through the P-Card system for items that the vendors were not providing to SEPTA. The false charges would cover the cash payments to Abell plus as much as double that amount to provide an equal share of fraud proceeds for the vendor.

David Abell and the vendors understood and agreed that the vendors would make these cash payments to Abell not only to generate fraud proceeds for themselves, but also to maintain and grow the vendors' business with SEPTA. As part of this understanding and agreement, Abell purchased goods for SEPTA from MSI and AIS and encouraged and directed other SEPTA managers and employees in the BBD to make purchases from MSI and AIS. Those managers and employees followed Abell's direction and made purchases from MSI and AIS without necessarily knowing why they were encouraged to use these vendors.

After agreeing to engage in this scheme, David Abell regularly solicited and demanded cash payments from the vendors. Irvello and Woloff then regularly provided

cash to Abell, generally in amounts between $1,000 and $2,000 per month. The vendors then charged the P-Cards of SEPTA managers for numerous items that they did not provide to SEPTA to cover the cash they gave to Abell and to generate substantial fraud proceeds for themselves.

Abell identified for the vendors the items for which to charge SEPTA on the P-Cards to make the charges appear legitimate and conceal the fraud from SEPTA and authorities. Specifically, at Abell's direction, the vendors then falsely billed SEPTA for products that they did not provide to SEPTA. The bills appeared legitimate on their face because they were for products that SEPTA might use, but in fact, did not need at that time. Similarly, at Abell's direction, the vendors also billed SEPTA for products that they did provide to SEPTA, but billed SEPTA for substantially more of those products than they actually provided. The vendors thus combined legitimate with fraudulent billing, making the scheme difficult to detect.

Working with Abell and other BBD managers, the vendors used the managers' P-Cards interchangeably to make it easier to generate fraud proceeds and bill SEPTA without exceeding the transactional limits on the individual P-Cards. The vendors thus used any manager's P-Card for transactions without regard for who was making a purchase or engaging in fraud with them.

Irvello and Woloff provided Abell with cash payments on a regular basis, approximately twice per month, from in or about 2013 until Abell left the employment of SEPTA on or about May 25, 2016.

2.  Martinez's Role in the Scheme

Approximately one year before David Abell left the employment of SEPTA, he retired from his position as Senior Director of Maintenance and became a contractor for SEPTA, continuing to work in SEPTA's BBD as he did as a manager. SEPTA replaced Abell with Rodney Martinez, making Martinez the new Senior Director of Maintenance, overseeing the other managers and employees in the BBD. Abell trained Martinez in his new position and introduced Martinez to the cash-payment aspect of the fraud and bribery scheme.

Vendors Irvello and Woloff then made regular cash payments to Abell and Martinez and continued to falsely bill SEPTA for products that they did not provide to SEPTA, as described above. The false billing covered the cash payments to Abell and Martinez and provided fraudulent proceeds for the vendors.

Beginning on or about May 25, 2016, when David Abell left the employment of SEPTA, Irvello and Woloff continued the fraud and bribery scheme with Martinez. That is, Martinez regularly solicited cash payments from Irvello and Woloff who provided cash to Martinez and fraudulently billed SEPTA through the P-Cards to cover the cash payments and the vendors' share of the fraud proceeds.

Around this time, Rodney Martinez invited defendant Jesse Fleck to join the scheme with Irvello and Woloff. At the request of Martinez, Fleck helped identify the items for which Irvello and Woloff would falsely bill SEPTA. Fleck then shared, in part, in the cash proceeds he obtained from Irvello and Woloff.

9

Several other SEPTA BBD managers, including those identified in the information, engaged in similar fraud activity with vendors Irvello and Woloff. Those managers solicited the vendors for cash and personal items at no cost to the SEPTA managers. The vendors agreed to provide the cash and personal items to the managers, and as the parties further understood and agreed, the vendors fraudulently billed SEPTA to cover the cost of those payments and products and to generate additional fraud proceeds for the vendors. Martinez began to engage in this scheme as early as 2014 when he obtained flooring for his home from Woloff. Martinez received other personal items as part of this scheme from Woloff and Irvello.

From in or about 2013 through in or about 2019, vendors Mark Irvello and Stanley Woloff, through their companies, each became one of SEPTA's largest billers on the P-Card. In doing so, Irvello defrauded SEPTA of more than $540,000, and Woloff defrauded SEPTA of more than $330,000. From in or about 2014 through 2019, during the time that defendant Martinez participated in the fraud and bribery scheme, Martinez obtained for himself approximately $144,285 in proceeds. Considering his role with others in the scheme (including Abell, Fleck, and the vendors), he is responsible for losses to SEPTA of approximately $292,345.

V.      **PLEA AGREEMENT**

The parties have entered into a written plea agreement, which is attached here as

Exhibit A.

Respectfully submitted,

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney

*Louis D. Lappen*
LOUIS D.  LAPPEN
Deputy United States Attorney

11

CERTIFICATE OF SERVICE

I hereby certify that on this date I caused a true and correct copy of the foregoing

Government's Plea Memorandum to be served by e-mail upon the following counsel for

the defendant:

Saul Steinberg, Esquire
415 Federal Street
Camden, NJ 08103
E-mail: ssteinberg@zswlaw.com


*Louis D. Lappen*
LOUIS D. LAPPEN
Deputy United States Attorney


Date: December 2, 2021

EXHIBIT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA            :

         v.            :            CRIMINAL NO. 21 - cr - 307

RODNEY MARTINEZ            :

### GUILTY PLEA AGREEMENT

Under Rule 11 of the Federal Rules of Criminal Procedure, the government, the defendant, and the defendant's counsel enter into the following guilty plea agreement.   Any reference to the United States or the government in this agreement shall mean the Office of the United States Attorney for the Eastern District of Pennsylvania.

      1.            The defendant agrees to plead guilty to Counts One and Two of an information, charging him with theft from an organization receiving federal funds and aiding and abetting, in violation of 18 U.S.C. §§ 666(a)(1)(A) and 2 (Count One); and bribery concerning an organization receiving federal funds, in violation of 18 U.S.C. § 666(a)(1)(B) (Count Two); and not to contest forfeiture as set forth in the notice of forfeiture charging criminal forfeiture under 18 U.S.C. §§ 981(a)(1)(C) and 982(a)(3)(A), and 28 U.S.C. § 2461.   These charges all arise from the defendant's participation in a fraud and bribery scheme in which vendors for SEPTA provided SEPTA managers, like the defendant, with cash and personal products to (1) generate illegal proceeds by falsely billing SEPTA for products the vendors did not provide; and (2) maintain and increase the vendors' business with SEPTA.   The defendant further acknowledges his waiver of rights, as set forth in the attachment to this agreement.

2.     The defendant agrees to cooperate fully and truthfully with the government as follows:

a.     The defendant agrees to provide truthful, complete, and accurate information and testimony.   The defendant understands that if he testifies untruthfully in any material way he can be prosecuted for perjury.

b.     The defendant agrees to provide all information concerning his knowledge of, and participation in the fraud and bribery scheme involving SEPTA described in this plea agreement and in the information, and any other crimes about which he has knowledge.   The defendant further understands and agrees that: (i) all information and cooperation provided after signing this agreement may be used for any purpose, including sentencing, and is not governed by any prior off-the-record proffer letter; and (ii) as of the date of the defendant's entry of a guilty plea, all information provided under any prior off-the-record proffer letter may be used for any purpose, including sentencing, and is not governed by any prior off-the-record proffer letter. The defendant agrees that the information provided under any off-the-record proffer letter may be used by the government to establish the factual basis for the guilty plea in this case.

c.     The defendant agrees that he will not falsely implicate any person or entity and he will not protect any person or entity through false information or omission.

d.     The defendant agrees to testify truthfully as a witness before any grand jury, hearing, or trial when called upon to do so by the government.

e.     The defendant agrees to hold himself reasonably available for any interviews as the government may require.

f.     The defendant agrees to provide all documents or other items under his control or which may come under his control which may pertain to any crime.

g.      The defendant understands that his cooperation shall be provided to any federal or other law enforcement agency as requested by the government.

h.      To enable the Court to have the benefit of all relevant sentencing information, the defendant waives any rights to a prompt sentencing, and will join any request by the government to postpone sentencing until after his cooperation is complete.

i.      The defendant agrees and understands that this agreement requires that his cooperation regarding any matter about which the defendant has knowledge as of the date of sentencing shall continue, upon the government's request, even after the time that the defendant is sentenced.   The defendant agrees that if the government determines that the defendant has failed to so cooperate following sentencing in this matter, the government may initiate a new prosecution of the defendant for any charges that were dismissed under this agreement, and may use in that prosecution any information provided by the defendant during the course of cooperation.   Further, the defendant agrees that in the event of such a later prosecution, he waives any right to object to prosecution for an offense of which a charge to which the defendant is presently pleading guilty is a lesser included offense, and also waives any defense based on the statute of limitations or the Double Jeopardy Clause.

j.      The defendant understands that it is a condition and obligation of this cooperation agreement that the defendant not commit any additional crimes after the date of this agreement.

k.      The defendant agrees that if the government determines that the defendant has not provided full and truthful cooperation, or has not provided full and truthful information about the defendant's assets, income, and financial status, or has committed any federal, state, or local crime between the date of this agreement and his sentencing, or has otherwise violated any

other provision of this agreement, then the government may at its option: (a) prosecute the defendant for any federal crime including, but not limited to, perjury, obstruction of justice, and the substantive offenses arising from this investigation, based on and using any information provided by the defendant during the course of cooperation; (b) upon government motion, reinstate and try the defendant on any counts which were to be, or which had been, dismissed, based on and using any information provided by the defendant during the course of cooperation; (c) decline to file any motion under USSG § 5K1.1; (d) withdraw any previously filed motion under USSG § 5K1.1; (e) be relieved of any obligations under this agreement regarding recommendations as to sentence; and (f) be relieved of any stipulations under the Sentencing Guidelines.   Moreover, the defendant's previously entered guilty pleas will stand and cannot be withdrawn by him.

l.      The decision both as to whether the defendant has violated the terms of this agreement and the election of a remedy or remedies will be in the sole discretion of the government.   The defendant understands and agrees that the fact that the government has not asserted a breach of this agreement or enforced a remedy under this agreement will not bar the government from raising that breach or enforcing a remedy at a later time.

3.      If the government in its sole discretion determines that the defendant has fulfilled all of his obligations of cooperation as set forth above, at the time of sentencing, the government will:

     a.   Move to dismiss Count Three of the Information, charging wire fraud.

     b.   Make the nature and extent of the defendant's cooperation known to the Court.

     c.   Move for departure from the Sentencing Guidelines pursuant to USSG § 5K1.1, if the government, in its sole discretion, determines that the defendant has provided complete and

substantial assistance in the investigation or prosecution of another person who has committed an offense, including testifying at any trial or proceeding as required.   The defendant understands and agrees that: (1) the government will exercise its sole discretion regarding whether and how to investigate any information provided by the defendant; (2) as of the date of this agreement no determination has been made as to the defendant's eligibility for a § 5K1.1 motion; and (3) the government may refuse to file a § 5K1.1 motion, and may withdraw any previously filed § 5K1.1 motion, if this plea agreement is breached in any way including the commission of a crime after the date of this agreement.

d.      Make whatever sentencing recommendation as to imprisonment, fines, forfeiture, restitution, and other matters which the government deems appropriate.

e.      Comment on the evidence and circumstances of the case; bring to the Court's attention all facts relevant to sentencing including evidence relating to dismissed counts, if any, and to the character and any criminal conduct of the defendant;   address the Court regarding the nature and seriousness of the offense; respond factually to questions raised by the Court; correct factual inaccuracies in the presentence report or sentencing record; and rebut any statement of facts made by or on behalf of the defendant at sentencing.

f.      Nothing in this agreement shall limit the government in its comments in, and responses to, any post-sentencing matters.

g.      The defendant's rights under this agreement shall in no way be dependent upon or affected by the outcome of any case in which he may testify.

4.      The defendant understands, agrees, and has had explained to him by counsel that the Court may impose the following statutory maximum sentences: Count One (theft from an organization receiving federal funds), 10 years' imprisonment, a three-year period of supervised

release, a $250,000 fine, and a $100 special assessment; and Count Two (bribery involving a program receiving federal funds), 10 years' imprisonment, a three-year period of supervised release, a $250,000 fine, and a $100 special assessment.

Total Maximum Sentence is: 20 years' imprisonment, a three-year period of supervised release, a $500,000 fine, and a $200 special assessment.   Full restitution of $292,345 also shall be ordered.   Forfeiture of $144,285, which represents all proceeds the defendant obtained from the fraud and bribery offenses, also may be ordered.

5.     The defendant further understands that supervised release may be revoked if its terms and conditions are violated.   When supervised release is revoked, the original term of imprisonment may be increased by up to two years on each of Counts One and Two.   Thus, a violation of supervised release increases the possible period of incarceration and makes it possible that the defendant will have to serve the original sentence, plus a substantial additional period, without credit for time already spent on supervised release.

6.     In order to facilitate the collection of the criminal monetary penalties to be imposed in connection with this prosecution, the defendant agrees fully to disclose all income, assets, liabilities, and financial interests, held directly or indirectly, whether held in his own name or in the name of a relative, spouse, associate, another person, or entity, and whether held in this country or outside this country.   Accordingly:

a.     The defendant will submit a completed Financial Statement of Debtor to the U.S. Attorney's Office, in a form it provides and as it directs, within 14 days of execution of this plea agreement.   The defendant promises that his financial statement and disclosures will be complete, accurate, and truthful.

- 6 -

b.      The defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report on him in order to evaluate the defendant's ability to satisfy any monetary penalty imposed by the Court.

c.      Upon request by the United States, the defendant also agrees to submit to a financial deposition or interview prior to sentencing, and provide all documents within the defendant's possession or control as requested by the U.S. Attorney's Office regarding the defendant's financial resources and that of the defendant's household.

d.      The defendant agrees not to transfer, assign, dispose, remove, conceal, pledge as collateral, waste, or destroy property with the effect of hindering, delaying, or defrauding the United States or victims.   The defendant otherwise shall not devalue any property worth more than $1,000 before sentencing, without the prior approval of the United States.

e.      The defendant also agrees to execute any documents necessary to release any funds held in any repository, bank, investment, other financial institution, or any other location in order to make partial or total payment toward any monetary penalty that the Court may impose.

f.      If the defendant fails to comply with this paragraph of the plea agreement or if any of the defendant's representations pursuant to the requirements set forth in this paragraph are false or inaccurate, the government may elect to: void this agreement; consider such representations in deciding whether to file or withdraw any motion under Guideline Section 5K1.1; and/or argue that the defendant is not entitled to a downward adjustment for acceptance of responsibility under Guideline Section 3E1.1. The government may also elect to: void the forfeiture portion of the agreement and try the forfeiture before the Court and seek a larger forfeiture; and/or pursue any and all forfeiture remedies available at law or equity.   The

- 7 -

defendant agrees to waive any right to a trial by jury on all forfeiture issues, and to waive any claim at trial based on any statute of limitations.

7.     The defendant agrees to pay restitution of $292,345 and a fine as ordered by the Court. The defendant agrees that any restitution or fine imposed by the Court shall be due and payable immediately and on such terms and conditions that the Court may impose.   In the event the Court imposes a schedule for the payment of restitution or fine, the defendant understands and agrees that such a schedule represents a minimum payment obligation and does not preclude the United States Attorney's Office from pursuing any other means by which to satisfy the defendant's full and immediately enforceable financial obligation under applicable federal and/or state law.

8.     The defendant agrees that forfeiture, restitution, fine, assessment, tax, interest, or other payments in this case do not constitute extraordinary acceptance of responsibility or provide any basis to seek a downward departure or variance from the applicable Sentencing Guideline range.

9.     The defendant agrees to pay the special victims/witness assessment in the amount of $200 before the time of sentencing and shall provide a receipt from the Clerk to the government before sentencing as proof of this payment.

10.     The parties agree to the following with respect to the forfeiture of assets:

a.     The defendant agrees to forfeit his right, title, and interest in the sum of $144,285, which represents the proceeds that he obtained from the offenses charged in Counts One through Three of the information, as explained in the Notice of Forfeiture in the information, and agrees to the entry of a money judgment against him in this amount.   The defendant agrees that, due to the defendant's acts or omissions, these proceeds are not currently

- 8 -

available to the government for forfeiture, and that the government is entitled to the forfeiture of substitute assets because one or more of the conditions in 21 U.S.C. § 853(p) have been met.

          b.      The defendant agrees to the entry of a preliminary order of forfeiture pursuant to Federal Rule of Criminal Procedure 32.2(b) as soon as possible after the guilty plea and before sentencing.   Pursuant to Rule 32.2(b)(4), the defendant further agrees that, upon the request of the government, the preliminary order of forfeiture may be made final before his sentencing.   The defendant waives all statutory deadlines, including but not limited to deadlines set forth in 18 U.S.C. § 983.

          c.      The parties agree that the U.S. Attorney's Office will recommend to the Attorney General that any payments by the defendant toward the money judgment be remitted or restored to eligible victims of the offense, pursuant to 18 U.S.C. § 981(e), 28 C.F.R. Pt. 9, and other applicable law, it being understood that the U.S. Attorney's Office has authority only to recommend such relief and that the final decision of whether to grant relief rests with the Department of Justice, which will make its decision in accordance with applicable law.

          11.      The defendant agrees to waive any claims, defenses, or challenges arising under the Double Jeopardy or Excessive Fines Clauses of the Eighth Amendment, resulting from any forfeiture imposed in this case and/or any pending or completed administrative or civil forfeiture actions, and stipulates that such forfeiture is not grossly disproportionate to his criminal conduct.

          12.      The defendant may not withdraw his plea because the Court declines to follow any recommendation, motion, or stipulation by the parties to this agreement.   No one has promised or guaranteed to the defendant what sentence the Court will impose.

          13.      Pursuant to USSG § 6B1.4, the parties enter into the following stipulations under the Sentencing Guidelines Manual. It is understood and agreed that: (1) the parties are free to

argue (except as stated below) the applicability of any other provision of the Sentencing Guidelines, including offense conduct, offense characteristics, criminal history, adjustments, and departures; (2) these stipulations are not binding upon either the Probation Office or the Court; and (3) the Court may make factual and legal determinations that differ from these stipulations and that may result in an increase or decrease in the Sentencing Guidelines range and the sentence that may be imposed:

        a.      The parties agree and stipulate that, under USSG § 2C1.1(a)(2), the base offense level for bribery as charged in Count Two is 12.

        b.      The parties agree and stipulate that, under USSG § 2C1.1(b)(1), the offense involved more than one bribe or extortion, resulting in a 2-level increase to the base offense level.

        c.      For Counts One and Two, the parties agree and stipulate that, under USSG § 2B1.1(b)(1)(G), the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained by the defendant SEPTA manager, or the loss to SEPTA, whichever is greatest, is more than $250,000 but less than $550,000, resulting in a 12-level increase to the base offense level. This amount was reasonably foreseeable to the defendant in connection with his scheme; and the defendant's Guideline range should be calculated based on this amount pursuant to USSG § 1B1.3.

        d.      The parties agree and stipulate that, under USSG § 2B1.1(a)(2), the base offense level for theft as charged in Count One is 6.

        e.      The parties agree and stipulate that, under USSG § 3B1.3, in connection with Counts One and Two of the information, the defendant abused a position of trust in a

manner that significantly facilitated the commission and concealment of the offense, resulting in a 2-level increase to the defendant's base offense level.

f.     The parties agree and stipulate that, as of the date of this agreement, the defendant has demonstrated acceptance of responsibility for his offense, making the defendant eligible for a 2-level downward adjustment under USSG § 3E1.1(a).

g.     The parties agree and stipulate that, as of the date of this agreement, the defendant has assisted authorities in the investigation or prosecution of his own misconduct by timely notifying the government of his intent to plead guilty, thereby permitting the government to avoid preparing for trial and permitting the government and the court to allocate their resources efficiently, resulting in a 1-level downward adjustment under USSG § 3E1.1(b).

14.     In exchange for the promises made by the government in entering this plea agreement, the defendant voluntarily and expressly waives all rights to appeal or collaterally attack the defendant's conviction, sentence, or any other matter relating to this prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law.   As part of this knowing and voluntary waiver of the right to appeal or collaterally attack the conviction and sentence, the defendant expressly waives the right to raise on appeal or on collateral review any argument that (1) the statutes to which the defendant is pleading guilty are unconstitutional and (2) the admitted conduct does not fall within the scope of the statutes.

a.     Notwithstanding the waiver provision above, if the government appeals from the sentence, then the defendant may file a direct appeal of his sentence.

- 11 -

b.      If the government does not appeal, then notwithstanding the waiver provision set forth in this paragraph, the defendant may file a direct appeal or petition for collateral relief but may raise only a claim, if otherwise permitted by law in such a proceeding:

i.      that the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 4 above;

ii.      challenging a decision by the sentencing judge to impose an "upward departure" pursuant to the Sentencing Guidelines;

iii.      challenging a decision by the sentencing judge to impose an "upward variance" above the final Sentencing Guideline range determined by the Court; and

iv.      that an attorney who represented the defendant during the course of this criminal case provided constitutionally ineffective assistance of counsel.

If the defendant does appeal or seek collateral relief pursuant to this subparagraph, no issue may be presented by the defendant in such a proceeding other than those described in this subparagraph.

15.      The defendant acknowledges that pursuing an appeal or any collateral attack waived in the preceding paragraph may constitute a breach of this plea agreement.   The government recognizes that the mere filing of a notice of appeal is not a breach of the plea agreement.   The government may declare a breach only after the defendant or his counsel thereafter states, either orally or in writing, a determination to proceed with an appeal or collateral attack raising an issue the government deems barred by the waiver.   The parties acknowledge that the pursuit of an appeal constitutes a breach only if a court determines that the appeal does not present an issue that a judge may reasonably conclude is permitted by an

exception to the waiver stated in the preceding paragraph or constitutes a "miscarriage of justice" as that term is defined in applicable law.

16.     The defendant waives any claim under the Hyde Amendment, 18 U.S.C. § 3006A (Statutory Note), for attorney's fees and other litigation expenses arising out of the investigation or prosecution of this matter.

17.     The defendant waives all rights, whether asserted directly or by a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. § 552, or the Privacy Act, 5 U.S.C. § 552a.

18.     The defendant is satisfied with the legal representation provided by the defendant's lawyer; the defendant and this lawyer have fully discussed this plea agreement; and the defendant is agreeing to plead guilty because the defendant admits that he is guilty.

19.     It is agreed that the parties' guilty plea agreement contains no additional promises, agreements, or understandings other than those set forth in this written guilty plea agreement, and that no additional promises, agreements, or understandings will be entered into unless in writing and signed by all parties.   In addition, the prior off-the-record proffer letter,

dated on or about July 22, 2020, is revoked as of the date this plea is entered.

JENNIFER ARBITTIER WILLIAMS
Acting United States Attorney


RODNEY MARTINEZ
Defendant

KATAYOUN M. COPELAND
Chief, Criminal Division
Assistant United States Attorney


SAUL STEINBERG
Counsel for the Defendant

LOUIS D. LAPPEN
Deputy United States Attorney


Date:  12/7/21

Attachment

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA          :

            **v.**          :          CRIMINAL NO. 21-cr-307

RODNEY MARTINEZ          :

## ACKNOWLEDGMENT OF RIGHTS

I hereby acknowledge that I have certain rights that I will be giving up by pleading guilty.

1.     I understand that I do not have to plead guilty.

2.     I may plead not guilty and insist upon a trial.

3.     At that trial, I understand

      a.     that I would have the right to be tried by a jury that would be selected from the Eastern District of Pennsylvania and that along with my attorney, I would have the right to participate in the selection of that jury;

      b.     that the jury could only convict me if all 12 jurors agreed that they were convinced of my guilt beyond a reasonable doubt;

      c.     that the government would have the burden of proving my guilt beyond a reasonable doubt and that I would not have to prove anything;

      d.     that I would be presumed innocent unless and until such time as the jury was convinced beyond a reasonable doubt that the government had proven that I was guilty;

      e.     that I would have the right to be represented by a lawyer at this trial and at any appeal following the trial, and that if I could not afford to hire a lawyer, the court would appoint one for me free of charge;

      f.     that through my lawyer I would have the right to confront and cross-examine the witnesses against me;

g.      that I could testify in my own defense if I wanted to and I could subpoena witnesses to testify in my defense if I wanted to; and

h.      that I would not have to testify or otherwise present any defense if I did not want to and that if I did not present any evidence, the jury could not hold that against me.

4.      I understand that if I plead guilty, there will be no trial and I would be giving up all of the rights listed above.

5.      I understand that if I decide to enter a plea of guilty, the judge will ask me questions under oath and that if I lie in answering those questions, I could be prosecuted for the crime of perjury, that is, for lying under oath.

6.      I understand that if I plead guilty, I have given up my right to appeal, except as set forth in the appellate waiver provisions of my plea agreement.

7.      Understanding that I have all these rights and that by pleading guilty I am giving them up, I still wish to plead guilty.

8.      I acknowledge that no one has promised me what sentence the Court will impose. I am aware and have discussed with my attorney that, at sentencing, the Court will calculate the Sentencing Guidelines range (including whether any departures apply), and then, in determining my sentence, will consider the Guideline range and all relevant policy statements in the Sentencing Guidelines, along with other sentencing factors set forth in 18 U.S.C. § 3553(a), including

(1) the nature and circumstances of the offense and my personal history and characteristics;

(2) the need for the sentence imposed-- (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(5) the need to provide restitution to any victims of the offense.

_____
RODNEY MARTINEZ
Defendant

_____
SAUL STEINBERG
Counsel for the Defendant

Dated:   _____